THOMSON, Respondent, v. MERIDIAN LIFE INSURANCE COMPANY, Indianapolis, Ind., Appellant.

(162 N. W. 373.)

(File No. 3857.   Opinion filed April 17, 1917.   Rehearing denied June 26, 1917.)

1. Corporations—Foreign Corporations—Right to Do Business in Another State—Excepted Classes—Rule.

Except as to federal corporations, and those engaged in interstate or foreign commerce, a corporation created in one state has no legal or constitutional right to do business in another.

2. Same—Foreign Corporations—State's Right to Impose Conditions to Transaction of Business, Constitutional, Federal, Limitations to Right—Rule.

A state may impose upon a foreign corporation, as a condition to coming into the state to transact business, any terms, conditions, or restrictions not repugnant to the Constitution or laws of the United States.

3.  Commerce—Interstate    Commerce—Insurance,    Whether    Commerce?

The business of insurance is not commerce; and a state may exclude foreign insurance companies from doing business within its jurisdiction.

4.  Corporations—Foreign Insurance Company, Process Against—Transitory Causes Arising Outside—Non-resident Plaintiff—Commmissioner of Insurance, Service on—Statutory Provisions Construed—Federal Review.

Laws 1909, Chap. 210, Sec. 13, provides that no foreign insurance company shall, directly or indirectly, issue policies, take risks, or transact business in this state, until it shall have appointed in writing the commissioned of insurance to be the attorney of such company in and for this state, upon whom all lawful processes in any action or proceeding against the company may be served with the same effect as if the company existed in this state, which authority under such power of attorney shall be in force as long as any liability remains outstanding against the company "in this state." Civ. Code, Sec. 885, provides that service of process upon foreign corporations may be made upon duly authorized agent in any action in which such corporation may be a party; and Code Civ. Proc., Sec. 110, Subd. 2, relating to service of summons, provides that such service can be made in respect to a foreign corporation only when it has property in this state, or the cause of action arose therein, or when such service is made within this state personally upon the authorized agent. **Held**, that the interpretation of such statutes, since the Fourteenth Amendment to the federal Constitution, may be subject to review by federal courts. **Held**, further, that by enacting said Sec. 13, the Legislature intended to cover transitory actions accruing in another jurisdiction in favor of non-residents, and that service may be made thereunder upon foreign insurance companies, with the same effect as if the company existed in this state.

5.  Appeals—Error—Instructions—No Exceptions to, Presumption of Correctness of.

Where no exceptions were taken to instructions, the Supreme Court will presume that the issues were submitted upon a correct statement of the law applicable to issues and evidence presented.

6.  Accord and Satisfaction—Transaction Amounting to—Settlement of Life Insurance Claim—Statutes.

Where, in negotiations between a beneficiary under a life in-

surance policy and the insurance adjuster, concerning the settlement of the claim and the amount due, the beneficiary, who was in poor circumstances, was advised as to what she was entitled to, by a third person, and the adjuster claimed that, owing to misrepresentations made by insured as to his habits in the use of intoxicants, the company was not liable in any sum, and beneficiary was paid one half the amount of the face value of the policy, which was accepted, receipted for in full, and the policy was thereupon surrendered; **held,** that such transaction amounted to an accord and satisfaction under Secs. 1177, 1179, and 1180, Civ. Code.

Appeal from Circuit Court, Fall River County. Hon. LEVI McGEE, Judge.

Action by Clara Belle Thomson, against the Meridian Life Insurance Company, Indianapolis, Ind., upon a policy of life insurance. From a judgment for plaintiff, and from an order denying a new trial, defendant appeals. Reversed.

*John Weaver, Charles S. Eastman,* and *William B. Dudley,* for Appellant.

*Lawrence H. Hedrick, Allen G. Fisher,* and *William P. Rooney,* for Respondent.

(4.) To point four of the opinion, Appellant cited: The Old Wayne Life Insurance Asociation v. McDonough, 204 U. S. 8, 51 L. Ed. 345; Hunter v. Mutual Reserve Life Insurance Co., 218 U. S. 573; Lafayette Insurance Co. v. French, 18 Howard, 404; Pennoyer v. Neff, 95 U. S. 714; St. Clair v. Cox, 106 U. S. 35; Riverside and Dan River Cotton Mills v. Menefee, 236 U. S. 130, 35 Supreme Court Rep. 579; St. Louis S. W. Ry. v. Alexander, 227 U. S. 218-227; Kendall v. American Automatic Loom Co., 198 U. S. 477; Conley v. Mathieson Alkali Works, 190 U. S. 406, 47 L. Ed. 1113; Goldey v. Morning News, 156 U. S. 518-522, 39 L. Ed. 517; Laws 1909, Chap. 210, Sec. 13; Riverside Etc. Mills v. Menefee, 236 U. S. 130; Bawknight v. Liverpool, London and Globe Ins. Co., 55 Ga. 194; National Coal Co. v. Cincinnati Gas Etc. Co., 131 N. W. 580; Simon v. Southern Railway Co., 236 U. S. 115-129 to 132; Frye v. Denver & R. G. R. Co., Advance Sheets Dec. 9, 226 Fed. Rep. 893.

Respondent cited: Old Wayne Mutual Life Insurance Company v. McDonough, 204 U. S., 8; Const., Art. III, Sec. 23, Art. XVII, Sec. 6; Blake v. McClung, 172 U. S. 239.

(6.) To point six of the opinion, Appellant cited: Carpenter v. Chicago M. & St. P. Ry. Co., 7 S. D. 584; Ency. Pl. & Pr., Vol. 1, p. 73.

SMITH, J. The following facts appearing in the record are material to a question of jurisdiction which is presented on this appeal:

Appellant, defendant in the action, is a corporation existing under the laws of Indiana, with authority to issue contracts of life insurance, and was duly authorized to do business in this state at the date of the transactions hereinafter referred to. On April 19, 1912, the plaintiff and her husband, Charles Bradley Thomson, were residents of the state of Texas. The defendant corporation having complied with statutory requirements, was duly authorized to transact the business of life insurance in Texas. On that date the defendant company issued in that state its insurance policy in the sum of $5,000 insuring the life of Charles Bradley Thomson, and naming plaintiff as beneficiary. On August 12, 1912, and while said policy was in force, Charles Bradley Thomson died in the state of Texas. After her husband's death, plaintiff became a resident of the state of Nebraska, and was a resident of that state at the commencement and trial of this action. On February 7, 1911, the defendant company, in compliance with section 13, c. 210, Laws 1909, appointed the insurance commissioner of South Dakota its authorized attorney to accept service of any lawful process against said company with the same legal force and validity as if served on the company; and stipulated that such authority should continue in force "so long as any liability remains outstanding against the company in this state." Summons and complaint in this action were served upon the insurance commissioner, in the city of Pierre, on November 1, 1912. On the 22nd of November, defendant served notice on plaintiff's attorneys, of a special appearance, stating that defendant appeared only for the purpose of objecting to the jurisdiction of the court. The objection, as stated in the notice of appearance, specified: First, that the summons and complaint were served on the insurance commissioner of the state of South Dakota; second, that the defendant, Meridian Life Insurance Company, was a foreign corporation organized under the laws of the state of Indiana; third, that the plaintiff is not a resident of this

state, but is a resident of the state of Nebraska; fourth, that the cause of action arose without the state of South Dakota, to wit, in the state of Texas; fifth, that the defendant corporation * * * has no outstanding liability against it in the state of South Dakota.

The foregoing facts were made to appear to the trial court by affidavits and the records and files in the action, and are undisputed. An order overruling and denying the objection to jurisdiction was entered on December 6th, to which order defendant duly excepted, and this ruling is assigned as error. Defendant thereupon answered, alleging: First, false and fraudulent representations and warranties in procuring the policy; second, an accord and satisfaction of plaintiff's claim in the state of Texas; third, a plea by way of a denial of jurisdiction, in which the facts above stated are set forth.

The question of jurisdiction, as affected by the power of the Legislature to bring foreign corporations within the state for all purposes of jurisdiction, must be determined. It is appellant's contention that an insurance corporation organized and existing under the laws of the state of Indiana, having entered into a contract of insurance in the state of Texas, with a resident of that state, the death of the insured having occurred and the cause of action having arisen in that state, and the plaintiff not being a resident of the state of South Dakota, cannot be brought within the jurisdiction of the courts of this state by service of process upon its duly authorized statutory agent.

The precise question is whether the statutory consent of a corporation to be sued in this state extends to and includes causes of action upon a contract where the contract was entered into in, the cause of action arose in, and the plaintiff is a resident of, a foreign state. This question has not been presented or considered in this jurisdiction. It is conceded that the defendant corporation has, in all things, complied with the statute, and is transacting business in this state. It is conceded that process was duly served upon the insurance commissioner, and we must assume that he forwarded a copy of such process to the defendant corporation in compliance with his duty, under the statute. It is conceded that the defendant, as a foreign corporation, has given the statutory consent to be sued in, and, so far as the statute requires, has

submitted itself to the jurisdiction of the courts of this state, in compliance with the statute. The defendant remains a foreign corporation It. has not, nor does the statute require it to, become an actual resident of the state.

[1-3] Excepting from their operation federal corporations and corporations engaged in interstate or foreign commerce, two rules appear to be well settled: First, that a corporation created in one state has no legal or constitutional right .to do business in another state. Second, a state may impose upon a foreign corporation as a condition to coming into the state to transact its business any terms, conditions, or restrictions that are not repugnant to the Constitution 'or laws of the United States. 6 U. S. Enc. 308-313. The business of insurance is not commerce, and a state may exclude foreign insurance companies from doing business within its jurisdiction. 6 U. S. Enc. 311.

[4] Service of process on the insurance commissioner, pursuant to and in compliance with the statute being conceded, the only question of jurisdiction is that which challenges the power of the Legislature to bring a foreign corporation within the jurisdiction of the state courts, and thus compel it to litigate therein claims of nonresidents arising in a foreign jurisdiction and not connected with any specific transaction of such corporation within the state. The jurisdictional question turns upon the power of the Legislature to prescribe conditions upon which a foreign corporation may transact business within the state, which conditions are not in any sense germane to and have no relation to the business which such corporation proposes to transact. In other words, is the power of the state Legislature to prescribe conditions absolute and unlimited? Or is such legislative authority limited to prescribing conditions having relation to the proposed business and which are reasonable and not merely arbitrary and capricious?

Section 13, c. 210, Laws 1909, relates expressly to insurance companies, and provides that:

"No foreign insurance company shall, directly 'or indirectly, issue policies, take risks or transact business in this state, until it shall have first appointed, in writing, the commissioner of insurance to be the true and lawful attorney of such company in and for this state, upon whom all lawful processes in any action

or proceeding against the company may be served with the same effect as if the company existed in this state.  Said power of attorney shall stipulate and agree, upon the part of the company, that any lawful process against the company which is served on said attorney shall be of the same legal force and validity as if served on the company, and that the authority shall continue in force so long as any liability remains outstanding against the company in this state.  A certificate of such appointment, duly certified and authenticated, shall be filed in the office of the commissioner, and copies certified by him shall be deemed sufficient evidence, and service upon such attorney shall be deemed sufficient service upon the principal.  Whenever any lawful process against any insurance company shall be served upon the commissioner, he shall forthwith forward a copy of the process served on him, by mail, post-paid, and directed to the secretary of the company; or, in case of companies in foreign countries, to the resident manager in this country; and shall also forward a copy thereof to the general agent of said company in this state."

While this statute does not require that a foreign corporation as a condition to transacting business in this state shall become a resident of the state, it does require that every foreign insurance company shall stipulate and agree that all lawful process in any action or proceeding against the company in this state may be served upon the commissioner of insurance, "with the same effect as if the company existed in this state," and that such service "shall be of the same legal force and validity as if served on the company."  It is probably true that the interpretation of such statutes, since the Fourteenth Amendment to the federal Constitution, may be subject to review by the federal courts, and in view of utterances of the Supreme Court of the United States may not be free from doubt.  In Simon v. South. R. Co. 236 U. S. 116, 35 Sup. Ct. 255, 59 L. Ed. 492, decided in January, 1915, Justice Lamar says:

"But this power to designate by statute the officer upon whom service in suits against foreign corporations may be made relates to business and transactions within the jurisdiction of the state enacting the law.  Otherwise, claims on contracts wherever made and suits · for torts wherever committed might by virtue of such compulsory statute be drawn to the jurisdiction of any

state in which the foreign corporation might at any time be carrying on business. The manifest inconvenience and hardship arising from such extra territorial extension of jurisdiction, by virtue of the power to make such compulsory appointments, could not defeat the power if in law it could be rightfully exerted. But these possible inconveniences serve to emphasize the importance of the principle laid down in Old Wayne Mutual Life Ins. Co. v. McDonough, 204 U. S. 22, 27 Sup. Ct. 236, 51 L. Ed. 351, that the statutory consent of a foreign corporation to be sued does not extend to causes of action arising in other states."

It is suggested that the language of Justice Lamar was obiter dictum, but it can hardly be doubted that it expresses the views of that eminent jurist, and it apparently stands without dissent or criticism by his associates. It may also be noted that this is the most recent utterance of that court and subsequent to the decision in Barrow S. S. Co. v. Kane, 170 U. S. 100, 18 Sup. Ct. 526, 42 L. Ed. 964, which appears to be the case relied upon by the learned annotater of the case of Pinney v. Providence Loan & Investment Co. as authority for the proposition that where the jurisdiction is not limited to business done within the state, either by the statutory provision relating to the mode of service of process, or those relating to the jurisdiction of the subject-matter, an action may be maintained against the corporation, either in the federal or state courts, on a cause of action not arising out of the business transacted within the state. The views of Justice Lamar appear to have been adopted in Fry v. Denver & R. G. Ry. Co. (D. C.) 226 Fed. 893. But it seems to be the general policy of our law to place individuals and foreign corporations coming into this state upon the same basis, so far as the right to sue them is concerned, and it is our duty to give effect to that intent until the federal courts shall affirm or deny the constitutionality of such legislation.

Section 885 of the Civil Code, the general law with reference to foreign corporations, provides that service of process may be made upon the duly authorized agent in any action in which said corporation may be a party. Subdivision 2, § 110, Code Civ. Proc., in relation to the service of summons, provides:

"But such service can be made in respect to a foreign corporation only when it has property in this state, or the cause of

action arose therein, or when such service shall be made within this state personally upon the * * * duly authorized agent thereof."

And that:

"Service made in any of the modes provided in this section shall be taken and held to be personal service."

We are also inclined to the view that the Legislature intended (section 13, c. 210, Laws 1909) to cover transitory actions accruing in another jurisdiction in favor of nonresidents, and that service may be made upon foreign insurance corporations, under that section, with the same effect as if the company existed in this state, and that:

"The weight of modern authority * * * seems to support the proposition that a modern corporation may be sued on a transitory cause of action in any jurisdiction where it can be found in the sense that service may be perfected upon an agent or officer transacting business for the corporation within that jurisdiction, and that in the absence of statutory provisions to the contrary, the residence of the plaintiff and the place at which the cause of action arose are not material questions to be determined to maintain jurisdiction if the corporation can be found and served." 12 R. C. L. § 91; Abbeville, etc., v. Western, etc., Co., 61 S. C. 361, 39 S. E. 559, 55 L. R. A. 146, 85 Am. St Rep. 890, note IV, p. 921.

The defendant alleges as an affirmative defense, in paragraphs 5, 6, and 7 of the answer, that the insured in his application falsely and fraudulently represented to the defendant that he had never used spirituous or malt liquors freely or to excess, and that he did not use to exceed two glases of malt liquors daily, and that he did not use any spirituous liquors; that said representations were false and fraudulent, and were made with intent to induce defendant to accept such application and issue said policy of insurance; and that he did use spirituous and malt liquors freely and to excess, up to the time of his death, and that the use of such liquors contributed to and was more or less the cause of his death.

[5] Defendant also pleaded an accord and satisfaction, in that the plaintiff agreed to accept and did accept from defendant the sum of $2,500 in full settlement and extinction of her claim of $5,000 under the policy. No exceptions were taken to the

instructions given the jury, and we must assume that the issues were submitted upon a correct statement of the law applicable to the issues and the evidence presented. Appellant assigns insufficiency of the evidence to sustain the finding of the jury, under either of the two defenses alleged. Respondent makes certain objections relating to the condition of the printed record, but we do not deem them of sufficient importance to merit discussion, inasmuch as counsel seem to concur in the view that we must examine the original record which is now before us.

At the close of plaintiff's evidence, and again at the close of all the evidence, defendant moved for a directed verdict specifying the particulars in which the evidence is alleged to be insufficient. We find it unnecessary to recapitulate or determine the sufficiency of the evidence to sustain the first defense pleaded. But we have examined with much care the entire evidence in the record relating to that defense, viz. fraud in the inception of the policy, and are convinced that the defense was meritorious, and such as appellant might properly, and in good faith interpose. It is, however, unnecessary to make further reference to that portion of the evidence, though we deem it proper to recapitulate briefly portions of the evidence which have a direct bearing upon the defense of accord and satisfaction, a consideration of which is decisive of this appeal. As to this defense it is necessary to consider the evidence in its bearing upon the bona fides of the accord and satisfaction in view of plaintiff's claim that she was induced to make settlement by means of false, fraudulent, and coercive representations by the agent of the defendant company. The evidence discloses that subsequent to the death of Thomson the company received information as to his habits and the probable cause of his death, which caused it to direct its attorney, Mr. Weaver, to see the plaintiff, and to make certain investigations as to false and fraudulent representations by deceased in procuring the policy. Mr. Weaver had an interview with the plaintiff at her home on the 19th of September. With reference to this interview, the plaintiff herself testified as follows:

"Q. You may tell what was said by him [Weaver], if anything, with reference to the claim that the company had a defense, or that the company was not liable, if he said anything. A. Yes. Q. Tell, as particularly as you can, what he said. If you cannot

give the language, the substance of it. A. He said he thought he had proof that Mr. Thomson had misrepresented himself in making an application, and he didn't feel that the company was liable for the full amount of the policy. Q. Right in that connection, about what did he say Thomson had made misrepresentations, if he told you? A. Something in regard to drinking. Said he drank more than he had stated in the policy. Q. And was there anything else that he said to you? A. No, not at that time. * * * I think that was about all that was said that morning. · Q. In that conversation did he say anything to you about whether or not they would pay the amount of the policy or any portion of it? A. Yes. Q. What did he say about that? A. He offered me $1,000. * * * Why he said something about taking $1,000, and would probably get nothing if I didn't, and they had to go ahead and enter suit, or something of that kind * * * I don't believe I can state the exact words, but something to the effect that I needed money, and probably would have to have money very soon, * * * I did need money. * * * Why, I needed money. I was in very poor circumstances at that time."

The witness further testified, in substance. That nothing further was said that day, but that a settlement was arrived at the evening of the next day at Mr. Fuqua's office. That Mr. Bigger and Mr. Fuqua were present. That she received the total sum of $2,500, $950 in currency, and the balance in a draft. That Mr. Fuqua told her it would be better for her to take that amount. That Mr. Weaver was going away that night, and if she didn't she probably would not get anything, if it were taken to court. That she held out for the full amount as long as she possibly could. That (before Mr. Weaver came in) Mr. Fuqua told her he would help her if she did not have the money. That after Mr. Weaver came, Fuqua said nothing, until finally he advised her perhaps she better take the $2,500. That Mr. Weaver plainly said he would not pay more than $2,500, and she was not entitled to that if he had to take it to court, or if she did, she would probably get nothing out of it. That Mr. Thomson had misrepresented himself physically in making application, or something to that effect. That he believed he had drank more than he had stated in the application. She did not think Mr. Thomson drank to excess. That she thought she had better take that

amount than nothing, as she had no one to go to. That if she did not accept that money, she would have had to send home for money. On cross-examination she testified: That she had talked with Mr. Fuqua about this life insurance policy before she saw Mr. Weaver. That he had assisted her in making proofs of loss. That his attitude was very friendly to her. That he said he would do anything he could to assist her in getting the money and making the settlement, and if necessary he would select a good honorable attorney. That he told her she need not sacrifice any of her interests, and he would see that she got everything she was entitled to. That at her first interview with Mr. Weaver, he suggested to her that she would likely want to consult somebody, and she said she would like to consult with Mr. Fuqua. That she relied on his advice and would like to consult with him. That after she had talked with Mr. Fuqua if she would send for him, he would come and see her in Mr. Fuqua's presence. That she talked with Mr. Fuqua; told him she didn't think $1,000 was enough. That Mr. Fuqua said he didn't think that was quite enough. That Mr. Weaver then came in, and shortly afterward Mr. Bigger came in. That Mr. Weaver said he would give $1,000 to settle the claim. That Mr. Fuqua said:

"If that is all you have to offer, I will have nothing to do with the settlement. She can do as she likes."

That Mr. Weaver said he had been around to see a number of people in Houston, and had learned from them that Mr. Thomson had drank to excess. That this was about 2 o'clock in the afternoon; and after making this offer, Mr. Bigger and Mr. Weaver went away and left her in Mr. Fuqua's office. That Mr. Bigger went back and forth from where Mr. Weaver was to Mr. Fuqua's office, and through him the offer of settlement was raised from time to time, during the afternoon up to $1,500, then finally to $2,000, and then that evening about dark Mr. Weaver finally agreed to give the $2,500. That Mr. Weaver told her, in substance, that the company wanted to be absolutely fair to its policy holders, and was willing to make that settlement, although they were not liable, and that Fuqua said to Weaver that even though he had evidence to prove that her husband drank to excess, still he ought to waive that aside and agree to pay half. That when evening came and Mr. Weaver met her again at Mr. Fuqua's

office and agreed to pay $2,500, she agreed to accept that sum. That she understood she was giving Mr. Weaver a receipt in full payment of the policy and in full settlement of anything the company might owe her under the policy, and signed the receipt in full settement. The receipt was identified by the witness, and is as follows:

"Houston, Texas, September 20, 1912.

"Received of the Meridian Life Insurance Company, Indianapolis, Indiana, nine hundred fifty and no-100 dollars ($950.00) in partial payment of the sum of twenty-five hundred dollars, in consideration of which and the payment of the remainder of said last named sum, I hereby agree shall be and hereby is in full payment of all claims due me as beneficiary under life insurance policy number J18398 of said insurance company issued on the life of Charles Bradley Thomson, dated April 12, 1912.

(Mrs.) Clara Belle Thomson."

Witness further testified: That she had the insurance policy with her at the time of this settlement, and receipted and surrendered the policy. That she was paid $950 cash. That Mr. Weaver drew a draft for $1,550, and she signed it, and that next day she and Mr. Fuqua took the draft to the bank with the receipted policy attached, and instructed the bank to deliver the policy to the company when the draft was paid, and that the company paid the draft, and the policy was surrendered.

Mr. Weaver testified, in substance: That when the company received the proof of death, it showed that the insured had died of paralysis. That he was 40 or 41 years of age. That the policy was issued in April, 1912, and he was dead in August, after paying one premium. That these facts led the company to believe there was something wrong with the insured when he took out the insurance that he had not mentioned in his application, and that the company began an investigation. That on his way he stopped at Houston, and found where Mr. Thomson lived, and where he had lived at various times. That he went to some people who knew him during his lifetime. That he talked with a woman in whose house Mr. and Mrs. Thomson had lived for some time, and was informed that Thomson was in the habit of getting intoxicated, and had been during the year he took out the insurance. That he talked with various people, and heard that

Thomson had been in the habit of drinking to excess. That Mr. McClure told him he had seen Thomson drunk before he took out the insurance. That he learned where Mrs. Thomson lived and went to see her, to inquire about the death and sickness and health of the insured, and asked her about these matters, and she asked him whether or not we were going to pay the policy. That he told her he had received information that he husband had drank to excess and had become intoxicated, and that he continued to do so after this insurance was taken out. That his drinking continued to his last illness and death, and he didn't believe the company was liable under the policy. That he told her he had not absolutely finished the investigation to his satisfaction, but did not believe the company was liable from what he had learned, and that the facts would develop stronger than he had had them in that direction. She said her husband did not drink to excess, and that was a mistake. He told her the company wanted to be fair. That if the investigation, when it was over, left the company in doubt as to whether her husband had defrauded the company, they would pay the policy in full, but if they were reasonably sure, as business people, that he had concealed from them the fact that he drank to excess, and that his drinking contributed to his death, the company would not be liable, but they might do something to avoid litigation and be entirely fair; told her that perhaps she would like to advise with somebody about what she would like to do toward settlement. She said that she would. That she would like to advise with Mr. Fuqua of the Hardy Oil Company, for whom her husband had been working since they lived in Houston. That she had got Mr. Fuqua to assist her in making proofs of death. That he told her to see Mr. Fuqua, and after they had consulted, and he had made further inquiries, he would be glad to see them together and talk about a settlement. That this was in the forenoon. That it was arranged that he would see them the next day. That he arrived at Mr. Fuqua's office about 2 o'clock the next day. That she and Mr. Fuqua were there. That he was introduced to Mr. Bigger, the local agent of the insurance company, in Mr. Fuqua's office. That the question arose about the policy, and he stated to them that he had information and evidence that he believed would conclusively prove that Mr. Thomson had been drinking to excess

for some time before he applied for this insurance policy, and called attention to the questions and answers in the insurance policy. That his drinking had contributed to the condition that led to paralysis and killed him, and that that was an absolute defense, and that the company was not liable under the policy. That if they were willing to talk about a settlement, the company would give something to the widow rather than spend money in the expense of litigation. That he would agree to give her $1,000.

[6] These statements are strongly corroborated by Mr. Fuqua and Mr. Bigger, who participated in the negotiations between Mr. Weaver and the plaintiff, which finally resulted in the settlement and payment under the policy. In fact there is no substantial conflict in the evidence as to what transpired at the time of this settlemen. That transaction amounted to an accord and saisfaction under sections 1177, 1179, and 1180 of the Civil Code.

A full and careful examination of the entire record and the evidence convinces us that the evidence is not sufficient to sustain respondent's contention that the written accord and satisfaction of her claim against the defendant company was obtained by fraud, misrepresentation, or coercion, and that the trial court erred in not sustaining appellant's motion for a directed verdict at the close of all the evidence.

The order and judgment of the trial court are therefore reversed.