Michael J. SHARKEY, Plaintiff and Appellee,

v.

WASHINGTON NATIONAL INSURANCE COMPANY, Defendant and Appellant.

No. 14517.

Supreme Court of South Dakota.

Considered on Briefs Oct. 25, 1984.

Decided Aug. 21, 1985.

employment as an oil field worker in Gillette, Wyoming, on July 21, 1977. He became acquainted with another young South Dakotan, Marvin Schumacher, who was employed by the same firm, and the two roomed together for a time.

As oil field workers are apparently wont to do, Sharkey and Schumacher stopped for a beer after work one day during the late summer of 1977. Upon entering the Center Bar in Gillette, they came to the rescue of a previously unknown individual who had been knocked to the floor and was being beaten up by a third party. The victim turned out to be one Carl McCoun, who was one of Company's agents. Grateful to his rescuers, McCoun would thereafter buy Sharkey and Schumacher a beer when he saw them from time to time in Gillette.

McCoun, who had been employed by Company since 1972, later sold Schumacher a life insurance policy with Company, of which more later.

Although McCoun was living in Billings, Montana, during this time, he also apparently kept a post office box in the small town of Decker, Montana, which he characterized as his agency headquarters.

After he had sold a policy to Schumacher, McCoun asked Schumacher if he knew of any of his friends who might be interested in obtaining life insurance. Schumacher then referred Sharkey to McCoun.

On the night of October 10, 1977, Schumacher and Sharkey visited with McCoun at the Center Bar in Gillette. Sharkey expressed an interest in obtaining a life insurance policy from McCoun. Inasmuch as McCoun did not have the necessary documents with him, he suggested that the three meet the following day at the Country Kitchen restaurant in Gillette.

In accordance with their agreement of the night before, the three men met in the Country Kitchen sometime after noon the

---

Charles Rick Johnson of Johnson, Eklund & Davis, Gregory, for plaintiff and appellee.

Dudley R. Herman of Herman & Wernke, Gregory, for defendant and appellant.

WOLLMAN, Justice.

This is an appeal by Washington National Insurance Company (Company), defendant, from a judgment entered on a jury verdict in favor of plaintiff, Michael J. Sharkey. We affirm.

Plaintiff's son Leo Sharkey (Sharkey), a native of Winner, South Dakota, obtained

next day, October 11. According to Schumacher's testimony, Sharkey signed several documents, including one that appeared to be similar to the application that ultimately was submitted to Company for approval. Schumacher, who was sitting next to Sharkey at the small table throughout the one to two hours that the three were in the Country Kitchen, further testified that he saw Sharkey remove two check blanks from his checkbook and give them to McCoun. The first check blank was left blank. The second was filled out by Sharkey before he gave it to McCoun.

Schumacher testified that he heard no discussion between McCoun and Sharkey regarding November 1, 1977, as being the date of the life insurance policy. Schumacher also testified that after all of the paperwork had been completed and the three men were getting ready to leave the restaurant, McCoun told Sharkey that "he was insured because if he got hit by a car on the way out he was insured...." (At trial, McCoun did not deny making this statement.)

McCoun testified that during the meeting with Schumacher and Sharkey on October 11 he entered the necessary information on a blank application form. He testified that although Sharkey signed several documents, including an authorization to disclose medical information, a form authorizing an automatic premium withdrawal from his bank account, and a counter check for $30 for the amount of the first month's premium, he did not sign the application itself. McCoun testified that Sharkey did not give him personalized check blanks from his checkbook because he did not have it with him on the 11th. McCoun then went on to testify that he couldn't remember whether Sharkey had signed the application on October 11. He stated that he and Sharkey agreed to meet in Sheridan, Wyoming, the next day.

McCoun further testified that he gave the completed application form to his wife in Billings so that she could transfer the information to a new application blank in her handwriting, which he described was more legible than his.

Although McCoun could not remember what time of day it was when he met Sharkey in Sheridan on October 12, he testified that he, his wife, Sharkey, and a young woman named Linda, whose last name McCoun could not remember, stopped at two bars in Sheridan and then went to Decker, Montana. Upon arriving in Decker, although at what hour neither McCoun nor his wife was able to recall, the four repaired to the local post office *cum* grocery store *cum* bar *cum* restaurant, where, according to McCoun, Sharkey indicated that he wanted the policy to become effective on November 1, 1977, because he was paid twice a month and it would be easier for the premium to be deducted from his account on the first of the month. McCoun inserted "Date Policy Nov. 1, 1977," on the application, and Sharkey then signed the application form in the several required places.

McCoun testified that on October 13, 1977, he went to Sharkey's apartment in Gillette, where Sharkey gave him two checks from his checkbook. Check number 103 was left blank and was marked "Void" so that Company could use it to establish the pre-authorized monthly check withdrawal account. Check number 104, dated October 11, 1977, in the amount of $30, was made payable to, and was ultimately deposited by, Company in payment of the first monthly premium on the policy. McCoun testified that upon receiving these two checks from Sharkey, McCoun returned the counter check that Sharkey had given him on October 11.

According to the testimony, Sheridan, Wyoming, is approximately 130 miles north of Gillette, Wyoming. Decker, Montana, is approximately 20 miles north of Sheridan.

Company records reveal that Sharkey worked for thirteen and one-half hours on October 12, 1977.

Sharkey was killed in an automobile accident in eastern Wyoming on October 30, 1977, his twenty-second birthday.

McCoun acknowledged that he had inserted "Decker, Montana" on a number of policies that he had written in Gillette, including the policy that he sold to Schumacher. An attorney from Company's home office testified that for a number of reasons, including the desire to evade the information required by the medical information report section of an application, Company's agents sometimes insert on an application a place of execution other than that at which the application in fact was signed. Schumacher testified that although he had signed the application for his policy in the Center Bar in Gillette, he inserted "Decker, Montana" as the place of execution at McCoun's direction, McCoun explaining to him that the reason for doing so "was for medical reasons so they wouldn't run a check on you if you ever had a DWI or anything, he said they wouldn't insure you."

Company's corporate counsel testified that had the policy's effective date been the same as the date of execution of the application, Sharkey would have been charged a premium based upon his then attained age of 21. Indeed, after reviewing Sharkey's application, one of Company's underwriters wrote to the Company's general agent in Great Falls, Montana, on November 2, 1977, stating, "You have requested a policy date of 11/1/77. The applicant's birth date is 10/30—would you want us to date before 10/30 to save the age? Please advise." The general agent responded, "Issue as requested. This is the one I called you on, deceased, killed in auto accident 10/30/77."

Corporate counsel testified that it is legal in all states to back-date the effective date of a policy for a period up to six months, and that Company routinely tries to give the best break to the policyholder with respect to the attained age that will be used for the purposes of calculating the premium. In Sharkey's case, the difference in the premium between an attained age of 21 and of 22 would have amounted to only some twenty-nine cents the first year. McCoun, as the writing agent, would have been entitled to a commission of 65% of the first year's premium, 10% of the

second year's premium, and 5% of the premium for the third through tenth years of the policy.

Plaintiff contended before the jury that the signatures on the back of the application were made with a pen having ink of a color different from that used to insert the signatures on the front of the application, arguing that someone other than Sharkey had added his purported signatures on the back of the application after discovering that the application was incomplete. Also, Sharkey's mother testified that in her opinion the signatures on the back of the application did not appear to be her son's. McCoun himself admitted that the signatures on the back of the application looked different and that they had been made with a pen different from that used to write the signatures on the front of the application.

The policy application signed by Sharkey indicated that it was to be a non-medical application, which meant that Sharkey would not be required to undergo a medical examination as a prerequisite to having the application approved. The policy that would have been issued to Sharkey had a dispute not arisen regarding the effective date would have provided under "General Provisions,"

This policy is issued in consideration of the application and the payment of premiums as provided herein. The Policy together with the application therefor, a copy of which is attached and made a part hereof, shall constitute the entire contract between the parties hereto.

The application signed by Sharkey contained the following section:

### CONDITIONAL RECEIPT

Received from _____ the sum of $_____ which is the amount shown in question 19 of Part 1 of the application for Life Insurance to the Washington National Insurance Company, Evanston, Illinois, bearing the same date and number as this receipt.

This Conditional Receipt does not create any temporary or interim insurance and

does not provide any coverage except as expressly provided herein. This payment is subject to the agreements contained in Part 1 and, if applicable, Part 2 of the application and to the following terms and conditions:

1. If the Company shall be satisfied that on the date of the application or the date of the last of any required medical examinations, whichever is the later date, the Proposed insured was insurable under the Company's rules governing the acceptance of risks at the classification and for the amount and plan of insurance applied for, and

2. If the amount paid with the application equal or exceeds a monthly premium for the insurance applied for, then insurance under the terms of the policy applied for shall take effect on the latest of the following dates: (a) the date of the application, (b) the date of the last of any required medical examinations or (c) the policy date, if any, requested in the application.

Unless all of the preceding conditions are met, there shall be no liability on the part of the Company except to return this payment.

Company's home office personnel approved Sharkey's application on November 10, 1977. Upon learning of Sharkey's death, however, Company did not issue a policy. Company instead sent plaintiff, the primary beneficiary listed on the application, a check for $30 in repayment of Sharkey's initial premium payment.

Had a policy been issued, it would have provided face amount coverage in the amount of $25,277.00, with a like amount for accidental death benefit coverage. The jury verdict was for $50,554.00, to which the trial court added prejudgment interest in the amount of $36,855.94, plus costs, for a total judgment in the amount of $87,-598.44.

### Jurisdiction and Choice of Law

The record reveals that on June 24, 1981, the South Dakota Director of Insurance certified that Company had fully complied with all requirements of state law and had been authorized to issue policies and to transact business within the state since January 1, 1977. This action was commenced by service of process upon Company by serving the Deputy Director of Insurance on December 6, 1979.

As a condition precedent to being authorized to engage in the transaction of business within the state, a life insurance company must comply with SDCL 58–6–39, which provides:

> Each insurer applying for authority to engage in the insurance business in this state shall appoint the director, and his successors in office, as its attorney to receive service of legal process issued against it in South Dakota. The appointment shall be made on a form designated and furnished by the director. The appointment shall be irrevocable, shall bind the insurer and any successor in interest to the assets or liabilities of the insurer, and shall remain in effect as long as there is in force in South Dakota any contract made by the insurer or obligations arising therefrom.

In *Thomson v. Meridian Life Insurance Co.*, 38 S.D. 570, 162 N.W. 373 (1917), this court held that a life insurance company that had complied with the provisions of the predecessor to SDCL 58–6–39 was subject to suit in this state by a resident of Nebraska based upon a claim for death benefits arising out of a life insurance contract issued by the company in the state of Texas, the state within which the death of the insured had occurred. The court adopted the view that a corporation may be sued on a transitory cause of action in any jurisdiction in which it may be served with process, and that the residence of the plaintiff and the place at which the cause of action arose are immaterial to the question of jurisdiction. 38 S.D. at 578, 162 N.W. at 376.

■ In view of the foregoing case authority and statute, we conclude that Company's contention that the South Dakota trial court lacked jurisdiction over it be-

cause of the fact that the policy was applied for and the death occurred in the state of Wyoming is totally without merit.

■ Company also contends that the trial court erred in applying South Dakota law to the substantive issues in the case. Company, however, has not indicated what law the trial court should have applied or how it was different from South Dakota law. That being the case, we consider Company's contention in this regard to be equally without merit.

### Effective Date of Policy

As has already been indicated, Sharkey's application was approved by Company on November 10, 1977. No medical examination was required as a condition precedent to this approval. The question for the jury was whether in fact the policy had been signed in Gillette, Wyoming, on October 11, 1977, with the understanding on the part of Sharkey that the policy was to become effective that date, or whether, as testified to by McCoun and his wife, the policy was signed in Decker, Montana, on October 12, 1977, with the effective date to be November 1, 1977. As is obvious from the verdict, the jury found the former to be the case.

In *Grandpre v. Northwestern Nat'l Life Ins. Co.*, 261 N.W.2d 804 (S.D.1977), we discussed at some length the various types of conditional receipts used by the life insurance industry and the purposes which those receipts serve. We need not determine whether the conditional receipt in the case before us is of the "satisfaction" or "approval" type or of the "insurable" type, or whether it creates a condition precedent or a condition subsequent. However the conditional receipt is construed, it is clear from the facts as found by the jury that its provisions were satisfied by Sharkey's payment of the initial premium and by Company's approval of the application. Thus we need not engage in the sometimes metaphysical exegesis employed by some courts to hold that coverage was provided under the terms of a particular conditional receipt. See, e.g., the cases cited in Justice Zastrow's dissenting opinion in *Grandpre*, 261 N.W.2d at 811.

■ Company contends that to affirm the jury's verdict would be to enforce an oral contract of insurance based upon McCoun's representations, which would be contrary to the established rule that an agent cannot bind his company to terms other than that expressed in the written policy of insurance. We do not so view the case. SDCL 58–11–39 provides:

Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended, or modified by any rider, endorsement, or application lawfully made a part of the policy.

See *Cheney v. Metropolitan Life Insurance Co.*, 370 N.W.2d 569 (S.D.1985), and *Halverson v. Metropolitan Life Ins. Co.*, 286 N.W.2d 531 (S.D.1979). When read as a part of the policy, as it must under the policy provisions and SDCL 58–11–39, the provisions in the conditional receipt are self-executing once it is determined that Sharkey desired that the policy become effective on the date the application was signed rather than some later date. Accordingly, once the jury found that the application in fact had been signed on October 11, 1977, and that Sharkey intended that the policy be effective as of that date, coverage became effective as of that date upon approval of the application by Company.

### Sufficiency of the Evidence

Company also challenges, although rather obliquely, the sufficiency of the evidence to sustain the jury's verdict.

■ It is well-settled law in this state that in examining the sufficiency of the evidence to support a verdict we view the evidence and the inferences drawn therefrom in a light most favorable to the verdict. See, e.g., *Zee v. Assam*, 336 N.W.2d 162 (S.D.1983); *Ebert v. Fort Pierre Moose Lodge # 1813*, 312 N.W.2d 119 (S.D.1981); and *State by and through Department of*

*Transportation v. Richey Motor Co.,* 296 N.W.2d 505 (S.D.1980).

 Likewise, it is not the function of this court on review to weigh conflicting evidence or to pass upon credibility of witnesses; that task lies within the province of the jury. *Lukens v. Zavadil,* 281 N.W.2d 78 (S.D.1979); *Kamp Dakota, Inc. v. Salem Lumber Co., Inc.,* 89 S.D. 696, 237 N.W.2d 180 (1975). It is quite obvious from our summary of the evidence that the jury was faced with sharply conflicting testimony. We cannot say that the testimony offered by plaintiff was so inherently incredible that reasonable minds could not accept it as being worthy of belief. Accordingly, we conclude that the verdict finds adequate support in the evidence.

### Prejudgment Interest

Company contends that the trial court erred in applying South Dakota law in determining the amount of prejudgment interest to be added to the jury verdict. Company suggests that Illinois law should have been applied inasmuch as the last acts performed in reference to Sharkey's application were performed in Company's home office in Illinois.

 We need not grapple with this issue, however, inasmuch as we agree with plaintiff that Company stipulated during the course of trial that the trial court should compute the amount of interest based upon South Dakota law. Accordingly, we conclude that Company has waived any argument that it may have on this issue.*

The judgment is affirmed.

FOSHEIM, C.J., MORGAN, J., and WUEST, Acting J., concur.

HENDERSON, J., concurs in result.

* As we recently held in *In re Certification of a Question of Law,* 369 N.W.2d 658 (S.D.1985), the computation of prejudgment interest is a matter for the trial court's determination.

HENDERSON, Justice (concurring in result).

Although I concur in the majority writing, the citation of *Cheney* brings to mind the principle of Continuity.[1] *See State v. Waff,* 373 N.W.2d 18, 26–27 (S.D.1985) (Henderson, J., concurring by separate writing). This citation also brings to mind the thought of Consistency.[2] It is good to have Continuity and it is good to have Consistency.

I maintained, as demonstrated by the authorities in my dissent in *Cheney,* 370 N.W.2d at 574, that the Metropolitan Life Insurance Company should pay the Cheney family under a group life insurance policy applied for by Cheney. I also strongly aver that the Washington National Insurance Company in this case owes the proceeds of a life insurance policy to the father of this young man who applied for insurance.

In *Cheney,* the decedent, Julian Cheney, applied for insurance. He paid a premium of $39.15 via a state payroll deduction. The premium was earned. Because of an administrative hiatus, created by thousands of checks which had to be printed for state employees, the Cheney family did not recover, for the "effective date of insurance" was lost in the complications of the computer world. But the just responsibility of honoring the insurance contract existed. In *Cheney,* (1) an application was made for insurance; (2) a man was eligible for insurance without a medical examination; (3) a premium was paid via a deduction from a payroll check; (4) a premium was earned; (5) the insurance company had *constructive* possession of the insurance premium; (6) insurance coverage was denied by the insurance company; and (7) this Court held there was no coverage because a "warrant date" was controlling and it adversely affected the "effective date of insurance."

1. Synonyms of Continuity: succession, sequence, chain.

2. Synonyms of Consistency: congruous, harmonized, accordant.

Here, we have a different name. Instead of Cheney, it is Sharkey. In *Sharkey*, (1) an application was made for insurance; (2) a man was eligible for insurance without a medical examination; (3) a premium of $30.00 was paid via a deduction from a checking account; (4) a premium was earned; (5) the insurance company had *actual* possession of the insurance premium; (6) insurance coverage was denied by the insurance company; and (7) this Court now holds that there is coverage. Again, the just responsibility of honoring the insurance contract exists. And again, I would judicially require the insurance company to pay the benefits of the policy. Sequence, accordant: good precepts.

In *Cheney*, there was no testimony as there was no jury trial. There, the parties stipulated to the documentary evidence and the facts for the trial court to consider. In *Cheney*, both parties moved for a summary judgment. The "effective date of insurance" was decided as a *matter of law*.

Here, this experienced, veteran trial judge permitted a jury, in effect, to decide the "effective date of insurance" as a *matter of fact*, for he gave the following instruction of law:

14. Ordinarily, under our law, the terms of a written contract cannot be varied or changed by oral testimony. However, in this case, the Court has allowed oral testimony to be introduced tending to show the moment in time when the effective date was written in space # 9 of the Application, Part 1, and to enable you to determine if the words "Date policy Nov. 1, 1977" then appeared in the Exhibit No. 3 at the time it was signed by Leo F. Sharkey, *or if those words were inserted after it was signed by Leo F. Sharkey*. If those words were written and appeared on the face of the Exhibit No. 3 at the time that Leo F. Sharkey signed Part 1 of the Application, then, in that event, you must find for the Defendant since the words formed a part of the written contract entered into with the Defendant.

If, however, you should find from all the evidence that the words "Date policy Nov. 1, 1977" were written into space # 9 of the Application, Part 1 *after* and following the time of Leo F. Sharkey's signing Part 1 of the Application without his written consent, then you may find for the Plaintiff.[3] (Emphasis supplied mine.)

This instruction was the heart of the lawsuit. It is to be noted that the insurance company did not object to the instruction. It is obvious the jury found that the insurance company, through one of its agents, tried to shuffle the October 11, 1977 "effective date of insurance" to November 1, 1977. If, in fact, the November 1, 1977 policy date was a part of the application when Leo Sharkey, decedent, signed it, then the coverage would not commence until that time, and appellee's cause of action would tumble. Sharkey was killed on October 30, 1977. However, the jury's clear finding is that the November 1, 1977 insertion was made by an agent of the insurance company after the original application was signed and, hence, was not consented to by this young oil field worker who bought an insurance policy and was killed shortly thereafter.[4] Surely, the trial court had in mind an old ruling in this Court when it permitted parol testimony to vary or change the "effective date of insurance" from November 1, 1977 back to the date of the application, October 11, 1977. That rule evolved from *Farmers' Elevator Co. v. Swier*, 50 S.D. 436, 210 N.W. 671 (1926), holding that in the absence of *fraud*, mistake, or accident, a written agreement which is complete, clear, and unambiguous in its terms and contains mutual contractual covenants cannot be changed or modified by parol or extrinsic evidence. Fraud or mistake was also recognized as an excep-

---

3. Jury Instruction 15 pertained to advising the jury on the law governing alteration of insurance policy applications.

4. Had the trial judge not permitted oral testimony to establish the insurance company's "alteration" per Jury Instruction 14 and 15, the parol evidence rule would be used as a sword rather than a shield.

tion to the parol evidence rule in *McCollam v. Littau*, 307 N.W.2d 144 (S.D.1981). This was a classic illustration of not only an exception under the statute, which the trial court recognized, but also an old legal maxim set in Latin: "In contractibus, rei veritas potius quam scriptura perspici debet." Literal translation: "In contracts, the truth of the matter ought to be regarded rather than the writing." Uniquely, therefore, a jury, not the legal community, determined the "effective date of insurance." A jury of peers produced a salutary result and I would affirm the judgment entered upon the jury verdict of $50,554.00 plus the prejudgment interest assessed by the trial court.